UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

James Bouzek,
    Debtor.

Case No. 04-24481-svk
(Chapter 7)

**MEMORANDUM DECISION**

  The issue is the valuation of the Debtor's 2001 Hyundai Elantra for purposes of redemption under § 722 of the Bankruptcy Code. Redemption allows a chapter 7 debtor to obtain the release of a security interest on exempt personal property or personal property that has been abandoned from the bankruptcy estate. 11 U.S.C. § 722 (2004). In order to redeem, the debtor must pay the amount of the "allowed secured claim" to the creditor in a lump sum. The allowed secured claim is determined by reference to § 506(a) of the Bankruptcy Code which provides in pertinent part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property . . . .

11 U.S.C. § 506(a).

  In *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 956 (1997), the Supreme Court held that for purposes of cramdown in chapter 13 proceedings, replacement value, rather than liquidation value, is the appropriate valuation standard under § 506(a). "Cramdown" is the bankruptcy procedure under which the debtor keeps collateral and pays the present value of the allowed secured claim over the life of the plan. 11 U.S.C. § 1325(a)(5)(A). Recently the Bankruptcy Court for the Northern District of Illinois applied the holding in *Rash* to a

redemption dispute, and required the debtor to pay the replacement value to redeem a vehicle under § 722. *In re Smith*, 307 B.R. 912, 921 (Bankr. N.D. Ill. 2004). The court in *Smith* recognized that "every authority considering the issue has declined to apply *Rash* to redemptions in Chapter 7, limiting *Rash's* analysis and valuation standard to Chapter 13 cramdowns." *Id.* at 916.

The creditor in this case invites the court to join the *Smith* court as lone voices of reason on this issue, and seeks an order requiring the Debtor to pay the car's retail value; the Debtor urges adoption of the majority rule limiting *Rash* to chapter 13 cramdown valuations, and requests valuation of the vehicle at a liquidation (wholesale) value. *Triad Financial Corp. v. Weathington (In re Weathington)*, 254 B.R. 895, 901 (B.A.P. 6th Cir. 2000); *In re Tripplett*, 256 B.R. 594, 598 (Bankr. N.D. Ill. 2000); *In re Donley*, 217 B.R. 1004, 1007 (Bankr. S.D. Ohio 1998) (in redemptions, creditor's allowed secured claim should be the amount that the creditor would receive if redemption did not occur and it were forced to repossess and sell collateral in the most beneficial manner it could). "Wholesale value," used by most courts interchangeably with "liquidation value," is "the secured creditor's expected recovery upon repossession and sale by auction or other wholesale means." *Weathington*, 254 B.R. at 899 n.1. In our case, according to the Debtor, the wholesale value of the vehicle is $4,405; the secured creditor's proposed "retail value" is $8,985.

The Supreme Court in *Rash* carefully analyzed the language of Bankruptcy Code § 506, especially the second sentence, which mandates that value is to be determined "in light of the purpose of the valuation and proposed disposition or use of such property." The Court stated:

> Over ACC's objection, the Rashes' repayment plan proposed, pursuant to § 1325(a)(5)(B), continued use of the property in question, *i.e.*, the truck, in the

2

debtor's trade or business. In such a 'cram down' case, we hold, the value of the property (and thus the amount of the secured claim under § 506(a)) is the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller.

520 U.S. at 960.

Although the Debtor here does propose to retain and continue to use the vehicle in question, the Debtor also proposes to pay the creditor a lump sum within 30 days for release of its lien. This disposition is different than cramdown. The Supreme Court provided this description of the distinction between surrender of the collateral and cramdown:

> When a debtor surrenders the property, a creditor obtains it immediately, and is free to sell it and reinvest the proceeds. We recall here that ACC sought that very advantage. If a debtor keeps the property and continues to use it, the creditor obtains at once neither the property nor its value and is exposed to double risks: The debtor may again default and the property may deteriorate from extended use.

*Id.* at 962.

The *Smith* court interpreted *Rash* to mean that replacement value is mandated under § 506(a) whenever the debtor proposes to keep the collateral. 307 B.R. at 918. However, the "disposition or use" of collateral under § 506(a) is different when a debtor keeps the collateral while paying over time and keeps collateral after paying a lump sum to obtain a release of the creditor's lien. In cramdown, the creditor is forced to accept the value of its collateral over time, often 3 to 5 years. While waiting for its payments, the creditor faces various risks, including lapses of insurance on the collateral, the failure of interest payments to keep pace with the depreciation, or the debtor's job loss, illness, injury or other cause for default on the plan. All of these risks are averted with redemption. The creditor receives the value of the collateral in a lump sum, promptly after the motion for redemption is filed. The creditor is now free to invest the proceeds of the collateral in new loans. Since the use or disposition of the collateral in the

3

redemption scenario is completely distinguishable from cramdown and in fact is much closer to a surrender of the collateral, why should a secured creditor in the redemption receive more than it would receive if the debtor surrendered the collateral, the creditor foreclosed, and received the proceeds? If the chapter 7 debtor is unable or unwilling to reaffirm his or her obligations to the secured creditor, the creditor should not oppose prompt redemption at the liquidation value:

> A debtor may redeem under Section 722, freeing up tangible personal property purchased for household use. Redemption currently requires a lump-sum payment of the value of the collateral or unpaid balance of the debt; whichever is less, within forty-five days after the first meeting of creditors. The creditor has no veto power here; it may only challenge the valuation. On the other hand, since payment is certain, quick, and equal to expected liquidation value, the creditor should be indifferent.

Marianne B. Culhane and Michaela M. White, *But Can She Keep the Car? Some Thoughts on Collateral Retention in Consumer Chapter 7 Cases*, 7 Fordham J. Corp. & Fin. L. 471, 476 (2002).

Recently, the Supreme Court issued another chapter 13 cramdown decision, this one regarding interest rates. In *Till v. SCS Credit Corp.*, the Court held that the proper interest rate to be applied to secured claims in a Chapter 13 plan was the national prime rate as adjusted for the specific risks of the debtors, without regard to the rate set out in the parties' security agreement. 124 S. Ct. 1951 (2004). Justice Thomas, in his concurring opinion stated:

> In *Associates Commercial Corp. v. Rash*, we utilized a secured-creditor-friendly replacement-value standard rather than the lower foreclosure-value standard for valuing secured claims when a debtor has exercised Chapter 13's cram down option. We did so because the statute at issue in that case reflected Congress' recognition that 'if a debtor keeps the property and continues to use it, the creditor obtains at once neither the property nor its value and is exposed to double risks: The debtor may again default and the property may deteriorate from extended use.'

4

*Id.* at 1967 (citations omitted). By contrast, the creditor here is receiving the value of the collateral, in a lump sum, without risk of the Debtor's default. Accordingly, redemption is more akin to surrender of collateral than cramdown, as the Debtor is surrendering the value of the collateral to the creditor in a lump sum, in a reasonably prompt period of time. *See Weathington*, 254 B.R. at 900 (no distinction in the economic consequences of surrender and redemption; in fact, creditors may receive more under redemption than surrender). This court finds compelling the Supreme Court's continued emphasis on the distinction between the creditor's receipt of the value of its collateral immediately and over time.

The court in *Smith* compared redemption favorably to cramdown, because in at least two circuits, debtors are allowed to redeem by making regular monthly payments over time. *Smith*, 307 B.R. at 918. However, this option is not available in the Seventh Circuit. *See, e.g., In re Edwards,* 901 F.2d 1383, 1386 (7th Cir. 1990); *Terre Haute First Nat'l Bank v. Davis (In re Davis)*, 20 B.R. 212, 213 (C.D. Ill. 1982). The *Smith* court also opined that delays in the redemption process could cause significant depreciation of the creditor's collateral, similar to a chapter 13 cramdown. But to prevent such a problem, a concerned creditor could move for relief from stay or adequate protection to protect its interest. Moreover, the valuation date could be adjusted back to account for delays in the process. *E.g., In re Henderson*, 235 B.R. 425, 428 (Bankr. C.D. Ill. 1999) (proper date for valuation for redemption purposes is the date of the redemption, but an earlier date might be used if the creditor demonstrated undue delay, gross negligence or other acts of the debtor which had unfairly decreased the value of the collateral); *In re Lopez*, 224 B.R. 439, 444 (Bankr. C.D.Cal. 1998).

5

Therefore, this court respectfully disagrees with *Smith's* interpretation of the *Rash* holding and declines to adopt the replacement value standard for redemption disputes. Instead, the court concurs with the reasoning of *Weathington, Tripplett* and *Donley*, that the wholesale value is the appropriate valuation standard to apply in § 722 cases.

This holding does not end the inquiry, however. The *Smith* court recognized the dizzying array of valuations available on the internet and elsewhere that are commonly used in consumer bankruptcy cases, when it is rarely economically feasible to hire expert appraisers for personal property valuations. In the instant case, the Debtor submitted a "Vehicle Condition Report" from Collateral Valuation Services, LLC of Cincinnati, Ohio. The report states that based on the Kelley Blue Book, the trade-in value of the vehicle is $4,405. It is apparent that the Debtor's expert appraiser has not seen the collateral, and no one from Collateral Valuation Services was present to testify in court. This court concurs with *Smith's* rejection of such a report as inadmissible hearsay. 307 B.R. at 913.

The National Automobile Dealers Association (NADA) guide, or similar recognized valuation source such as the Kelley Blue Book or the Black Book, would be acceptable and admissible under Rule 803(17) of the Federal Rules of Evidence. *Id.* at 917. The *Smith* court also noted the confusing variety of valuation standards contained in the NADA and other guides, including "trade-in value," "private party value," and "average finance value." *Id.*

In *In re Henderson*, the debtors argued that the average loan value should be adopted as the redemption price, but the court held that the NADA average trade-in value, based on auction reports and dealer wholesale reports, is the best indicator of wholesale value. 235 B.R. at 429. *See also In re Stembridge*, 287 B.R. 658, 664 n. 17 (Bankr. N.D. Tex. 2002) ("Trade Value"

6

Case 04-24481-svk    Doc 16    Filed 06/25/04    Page 6 of 8

given in NADA guide roughly the same as wholesale value); *In re Thayer*, 98 B.R. 748, 750 (Bankr.W.D.Va. 1989) (same); *But see In re Podnar*, 307 B.R. 667, 672 (Bankr. W.D. Mo. 2003) (quoting from the NADA guide that the projected trade-in value is not an auction or wholesale value).

*In re Gonzalez* involved a recent vehicle valuation dispute in a chapter 13 case. 295 B.R. 584 (Bankr. N.D. Ill. 2003). The debtor presented expert testimony of Akin Ojuluwayo, "an experienced used car dealer who regularly buys, sells, and appraises cars." *Id.* at 586. The creditor relied on the NADA guide. The court stated:

> The NADA guide, meanwhile provides both a wholesale and a retail price for each vehicle. Unlike Black Book and Kelley Blue Book prices, however, NADA prices do not vary with the vehicle's condition. The NADA guide assumes that all vehicles are, as Mr. Olujuwayo (sic) put it, 'extra clean.' Consequently, the prices in the NADA guide are typically higher than prices in the Black Book or Kelley Blue Book.

*Id.* at 587.

Considering the various sources and definitions available, and mindful that "whatever approach is adopted must seek to balance the competing interests of debtor and lienholder," this court finds that a NADA guide trade-in value of a vehicle would be admissible and persuasive evidence of wholesale value, unless the vehicle has suffered damage or other problem that would render the Kelley Blue Book or Black Book a more appropriate gauge of value. *Zell v. Chevy Chase Bank (In re Zell)*, 284 B.R. 569, 572 (Bankr. D. Md. 2002) (citing *In re Waters*, 122 B.R. 298, 300 (Bankr. W.D. Tex. 1990)). Moreover, in unusual cases and with competent evidence, a vehicle's NADA trade-in value could be shown to be too low or too high. In *Rash*, the Supreme Court recognized that the replacement value of the collateral could vary from case to case depending on the evidence presented. 520 U.S. at 965 n.6.

7

In this case, there is no evidence that there is any damage to or mechanical problems with the vehicle, nor is there any indication that the vehicle is in better condition than the NADA average trade-in value. Accordingly, an Order will be entered overruling the Objection to the Motion for Redemption, without prejudice to the Objection being reconsidered if the Debtor does not pay the NADA trade-in value to the secured creditor in a lump sum within 30 days of the date of the Order.

Dated: June 24, 2004

By the Court:

*Susan Kelley*
Susan V. Kelley
U.S. Bankruptcy Judge